# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
# DIVISION ONE

| | |
|---|---|
| PHILLIP TRAULSEN; RICHARD AND CAROL TRAULSEN,<br><br>     Appellants/Cross-Respondents,<br><br>     v.<br><br>CONTINENTAL DIVIDE INSURANCE COMPANY,<br><br>     Respondents/Cross-Appellant,<br><br>and<br><br>EPHRATA TRUCKING LLC; SAMY ZEWDU; EVERGREEN ADJUSTMENT SERVICES INC; MACK TRUCKING LLC; STATE NATIONAL INSURANCE COMPANY; MICHAEL BEYENE; ATSEBHA HAGOSE; WONDWOSSEN MERSHA; JOHN DOES,<br><br>     Defendants. | No. 82507-1-I<br><br>ORDER DENYING APPELLANTS/CROSS-RESPONDENTS' MOTION TO MODIFY COMMISSIONER'S FEBRUARY 9, 2024 RULING, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Appellants/Cross-Respondents Phillip Traulsen, and Richard and Carol Traulsen, filed a motion to modify the commissioner's February 9, 2024 ruling on attorney fees and costs. Respondent/Cross-Appellant Continental Divide Insurance Company filed a response and the Traulsens filed a reply. We have considered the motion under RAP 17.7 and have determined that it should be denied.

The commissioner both correctly determined that our April 10, 2023 opinion did not address the Traulsens' request for attorney fees on appeal and correctly interpreted the scope of authority under RAP 18.1 in declining to rule on a request for fees in the first instance. Nevertheless, we hereby withdraw our April 10, 2023 opinion and substitute it with a new opinion to address attorney fees. The attorney fees are addressed on page 58, line 15 of the new opinion as follows:

<u>Attorney Fees on Appeal</u>

Phillip requests an award of attorney fees on appeal under the CPA, IFCA, and *Olympic Steamship*. RAP 18.1(a) authorizes attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." Because we conclude that Phillip was entitled to attorney fees below on all three bases, we award reasonable attorney fees to Phillip on appeal, subject to compliance with RAP 18.1.

Therefore, it is hereby

ORDERED that the Appellants/Cross-Respondents' motion to modify the commissioner's February 9, 2024 ruling is denied; and it is further

ORDERED that the opinion filed on April 10, 2023 shall be withdrawn and substituted with a new unpublished opinion.

_____
Mann, J.

_____
Feldman, J.

_____
Coburn, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PHILLIP TRAULSEN; RICHARD AND CAROL TRAULSEN, | No. 82507-1-I |
| Appellants/Cross-Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CONTINENTAL DIVIDE INSURANCE COMPANY, | |
| Respondents/Cross-Appellant, | |
| and | |
| EPHRATA TRUCKING LLC; SAMY ZEWDU; EVERGREEN ADJUSTMENT SERVICES INC; MACK TRUCKING LLC; STATE NATIONAL INSURANCE COMPANY; MICHAEL BEYENE; ATSEBHA HAGOSE; WONDWOSSEN MERSHA; JOHN DOES, | |
| Defendants. | |

MANN, J. — Phillip Traulsen and his parents, Richard and Carol,[1] appeal several summary judgment orders relating to their claims against insurer Continental Divide Insurance Company (CDIC), arising out of a traffic accident in

---

[1] We refer to the parents and son collectively as "Phillip" and use his first name for clarity.

which a tractor trailer driven by CDIC insured Samy Zewdu struck Phillip, a pedestrian, causing catastrophic injuries.  CDIC cross appeals several of the same and additional summary judgment rulings.

Phillip brought suit against CDIC on his own behalf and as assignee of claims held by CDIC insureds, Ephrata Trucking and Zewdu, alleging breach of contract, bad faith, negligence, and violations of the Insurance Fair Conduct Act (IFCA)[2] and the Consumer Protection Act (CPA).[3]  After a series of summary judgment rulings granting and rejecting various legal claims and theories of liability, the trial court entered final judgment against CDIC in the principal amount of $1,535,980.15 and awarded Phillip statutory attorney fees and costs.

Phillip and CDIC challenge several of the court's summary judgment rulings. Because the assignments of error are so numerous, we have organized the issues as follows:

### A.  IFCA Claims

(1) CDIC contends the trial court erred in holding it liable under IFCA as a matter of law for not paying $1 million in policy benefits after the trial court confirmed a multimillion-dollar arbitration award against CDIC's insureds;

(2) CDIC argues the trial court erred in holding that CDIC was judicially estopped from claiming that its obligation to pay interest on the arbitration award was not triggered by its confirmation;

---

[2] RCW ch. 48.30.
[3] RCW ch. 19.86.

(3) Both Phillip and CDIC challenge the trial court's calculation of postjudgment interest owing under the policy;

(4) CDIC and Phillip both contend the trial court erred in finding genuine issues of material fact on Phillip's claim that the nonpayment of interest on the $1 million was an unreasonable failure to pay policy benefits under IFCA;

(5) Phillip challenges the trial court's conclusion that Phillip cannot establish that the insureds sustained actual damages under IFCA;

(6) Phillip argues the trial court erred in denying his request for attorney fees under *Olympic Steamship*, the CPA, and IFCA.

## B. Bad Faith Claims

(1) Phillip argues CDIC is liable as a matter of law for the tort of bad faith for refusing to disclose its insureds' policy limits before he initiated litigation against those insureds;

(2) Phillip challenges the dismissal of his bad faith claim that CDIC breached its duty to settle by failing to extend a policy limits settlement offer until February 2018; and

(3) Phillip contends the trial court erred in concluding that CDIC's insureds could not establish that they were harmed by any of the acts or omissions of CDIC.

## C. PIP Coverage Claim

Phillip appeals the trial court ruling that CDIC had no obligation under RCW 48.22.085(1) to offer PIP coverage to Ephrata and that, as a result, Phillip has no direct claim against CDIC for PIP benefits against CDIC.

We affirm in part and reverse in part the trial court's summary judgment orders as set out more fully below.

## FACTS

On the morning of April 10, 2017, Samy Zewdu, driving a commercial semi-truck and trailer, struck Phillip Traulsen as he walked across South 212th Street in Kent on his way to work at Amazon. Phillip sustained head trauma and multiple broken bones, requiring months of hospitalization and resulting in severe permanent injuries.

A witness to the accident told police that Phillip had a "white light," indicating he could cross the street and that Zewdu's truck was travelling around 40 miles per hour when it entered the intersection against a red light. Zewdu admitted he was driving 40 miles per hour, but said he had a green light when Phillip walked in front of his vehicle. Neither Zewdu nor Phillip was cited for the incident.

Ephrata Trucking, LLC owns the commercial truck Zewdu was driving and is insured by Continental Divide Insurance Company (CDIC). Under CDIC's commercial liability policy, Ephrata—of which Zewdu is a member—had $1 million in liability coverage.

CDIC hired Evergreen Adjustment Service to investigate the accident. Evergreen interviewed two witnesses to the accident who stated that Zewdu ran a red light. Evergreen reported this information to CDIC on May 3, 2017. CDIC instructed Evergreen to identify other sources of possible insurance coverage, but Evergreen did not discover that the trailer attached to Zewdu's truck at the time of

the accident was owned, not by Ephrata, but by Mack Trucking, LLC and separately insured under a policy issued by State National Insurance Company.

On May 11, 2017, Phillip's attorney asked CDIC to disclose all insurance coverages and liability limits. CDIC informed counsel that it was unable to determine if disclosure of its policy limits was within its insureds' best interest and declined Phillip's request.[4] It indicated, however, that the policy did not provide personal injury protection (PIP) coverage.

Phillip and his parents sued Ephrata and Zewdu on May 27, 2017, in King County Superior Court No. 17-2-13809-6. Soon after, CDIC advised its insureds that they faced liability beyond the $1 million policy limit and suggested they hire personal counsel. CDIC disclosed its policy limits to Phillip in response to his first set of interrogatories on July 26, 2017.

On February 16, 2018, CDIC offered its policy liability limits in exchange for "a release of all claims for all insureds under the policy and dismissal of the lawsuit." Phillip rejected the offer. On March 16, 2018, CDIC again advised its insureds to retain their own counsel because "[i]t appears likely that a jury will award [Phillip] more than $1 million in damages."

The parties attended mediation on April 13, 2018. Phillip contends mediation failed because everyone was confused about the belated discovery of Mack Trucking's insurance policy covering the trailer.[5] Zewdu signed a proposed settlement agreement, in which he and Ephrata offered to allow for the entry of a

---

[4] It is undisputed that both Ephrata Trucking and Zewdu are CDIC's insureds.
[5] CDIC informed its insureds about the possible additional coverage a week later.

"partial judgment against them for all insurance limits," including CDIC's $1 million in liability limits plus interest, to assign any claims they had against CDIC and others to Phillip, and to have the total amount of Phillip's damages determined by arbitration in exchange for Phillip's covenant not to execute on any verdict, award, or judgment against them except for the insurance policies or assigned assets. Phillip and his parents never signed this document. The parties subsequently stipulated to arbitrate "all remaining issues" in May 2018. CDIC was aware of this stipulation and agreed to participate.

On June 6, 2018, the arbitrator determined that Phillip was not contributorily negligent for his injuries. On July 27, 2018, the arbitrator issued a final award finding Phillip's total damages to be $10,608,092. The arbitrator ruled that "[j]udgment may be entered in favor of Plaintiffs and against Defendants Sammy and Jane Doe Zewdu and Ephrata Trucking . . . in accord with the above award." The superior court confirmed the award on August 31, 2018. A week later, CDIC again offered Phillip its $1 million policy limits "in exchange for a release and full and final settlement of [his] claims . . . against any and all insureds." According to counsel for CDIC, Phillip's counsel never responded to this offer.

On July 16, 2018, while the parties were in arbitration, CDIC filed a declaratory judgment action in the U.S. District Court for the Western District of Washington against Zewdu, Ephrata, and Phillip, seeking to limit its liability to the $1 million policy limit and a judicial determination that it had not breached the policy, or acted negligently, in bad faith, or in violation of the CPA or IFCA. *Continental Divide Ins. Co. v. Ephrata Trucking, LLC et al.*, No. C18-1042-JCC WL

4385433 (W.D. Wash.). That court stayed the federal suit pending the outcome of the state proceedings.

Between the date the court confirmed the arbitration award and March 2019, CDIC refused to pay policy limits to reduce the insureds' liability for the confirmed award.

On March 5, 2019, Ephrata, Zewdu and Phillip entered into a settlement agreement. Ephrata and Zewdu agreed to assign all claims against their insurers to Phillip and to cooperate in the prosecution of those claims. In return, Phillip agreed to assume primary responsibility for the defense of CDIC's federal declaratory judgment action and to share any money collected in excess of the arbitration award. The agreement also provided "that the unpaid portions of the award shall accrue interest at 12% compounded per annum from April 10, 2017 until paid." Finally, the agreement provided:

> In exchange for and contingent upon satisfaction of all the above consideration, Plaintiffs covenant to (1) delay entry of judgment on the award until they deem necessary, (2) to enter and execute judgment by first proceeding against defendants' insurance, the assigned claims, assets or trust, and/or against other potential defendants/entities, and (3) to not execute judgment on Zewdu's personal property or assets once Plaintiffs recover all applicable insurance policy benefits/limits.

On April 9, 2019, Phillip, Ephrata and Zewdu stipulated to the filing of an amended complaint in which Phillip asserted assigned claims against CDIC and new claims against Mack Trucking and its insurer, State National Insurance Company. Evergreen Adjustment Services moved to dismiss the amended complaint, arguing that Phillip's "claims were fully litigated in the arbitration, the arbitrator's Final Award was confirmed at Plaintiffs' request, and judgment was

entered" and CDIC joined Evergreen's argument. The trial court in No. 17-2-13809-6 dismissed the amended complaint on this ground.

Phillip then filed this action, King County Superior Court No. 19-2-20293-9, on August 1, 2019, asserting claims against CDIC, Mack Trucking and State National.[6] Over the course of the next year, both Phillip and CDIC filed several summary judgment motions that form the basis of this appeal. On January 3, 2020, the trial court denied CDIC's motion to dismiss the claims against it on the basis that the federal court had exclusive jurisdiction over the action. The trial court also granted Phillip's motion for partial summary judgment finding that CDIC had a duty to pay $1 million in liability proceeds as soon as the court had confirmed the arbitration award and ordered it pay these benefits to Phillip.[7] The trial court also denied Phillip's motion for partial summary judgment that CDIC breached a duty to provide PIP coverage to Phillip.

On February 14, 2020, after obtaining court permission to do so, CDIC paid the $1 million in liability benefits into the court registry.

On March 17, 2020, CDIC moved for partial summary judgment on Phillip's claims under IFCA, arguing that it never denied coverage or benefits to its insureds, as required for an insured to maintain a cause of action under RCW 48.30.015(1). In response, Phillip filed a cross motion for summary judgment, arguing that CDIC's failure to tender liability benefits, interest, and PIP coverage rendered it liable under IFCA as a matter of law. In its June 19, 2020 summary

---

[6] Phillip settled his claims against Mack Trucking and its insurer State National, and voluntarily dismissed those parties. They are not parties to this appeal.

[7] CDIC sought discretionary review of both orders. Both this court and the Supreme Court (no. 98895-1) denied discretionary review.

judgment order, the trial court concluded: (1) that CDIC was liable under IFCA for unreasonable failure to pay policy benefits, (2) CDIC did not owe postjudgment interest because the arbitration award had not been entered as a judgment, and (3) questions of fact existed as to whether CDIC unreasonably denied Phillip PIP coverage. The court reserved for trial "a determination of the actual damages from the unreasonable failure to pay the policy benefits toward the July 31, 2018 arbitration award." On reconsideration, the court amended its order to deny partial summary judgment to CDIC on the postjudgment interest issue, concluding that CDIC was judicially estopped from arguing that the confirmation of the arbitration award was not a final judgment triggering the accrual of interest.

On September 21, 2020, the trial court directed the court clerk to disburse the funds in the court's registry to Phillip. The same day, the court granted Phillip's motion for partial summary judgment establishing CDIC's liability for bad faith, breach of contract, and violation of the CPA based on the court's prior ruling that CDIC had acted in bad faith in failing to timely pay the liability benefits owed following the July 2018 arbitration.

On January 8, 2021, the trial court issued another round of summary judgment orders. First, the trial court denied Phillip's motion seeking to establish CDIC's liability for mishandling his claims for PIP benefits and interest under a "Supplementary Payment" provision of the policy. Second, the court granted in part Phillip's motion regarding the amount of interest CDIC owed, concluding that CDIC owed postjudgment interest on the arbitration award from August 31, 2018, when it was confirmed, until October 2, 2020, when the clerk of court paid the full

amount of liability benefits out of the court's registry. The court awarded interest at the statutory rate of 7 percent interest for tort claims, rather than the 12 percent contractual rate Phillip sought based on the assignment agreement, totaling $1,550,221.15.

Next, the trial court granted CDIC's motion for partial summary judgment, barring Phillip from bringing first-party personal injury claims against CDIC because "the confirmed arbitration award . . . was a final determination of all claims." Finally, the trial court granted CDIC's motion for partial summary judgment regarding Phillip's claim that CDIC violated its duty of good faith to its insured by refusing to disclose its policy limits to Phillip's attorney, concluding as a matter of law that CDIC acted reasonably and in good faith when it declined to disclose its policy limits 31 days after the accident.

On March 8, 2021, the trial court entered its final round of summary judgment orders. It concluded there remained genuine issues of material fact as to whether CDIC acted reasonably and in good faith by not making a settlement offer until February 2018. But the court granted CDIC's motion to dismiss Phillip's assigned claims, concluding as a matter of law that the insureds could not establish that CDIC's conduct proximately caused any injury or damages to them.

Shortly thereafter, the trial court granted CDIC's motion for entry of final judgment. The trial court denied Phillip's motion for attorney fees, concluding he was not entitled to an award of fees under *Olympic Steamship*,[8] the CPA, or IFCA.

Both Phillip and CDIC appeal several summary judgment rulings.

---

[8] *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991).

ANALYSIS

Standard of Review

Phillip and CDIC appeal the trial court's summary judgment orders. We review a summary judgment order de novo and perform the same inquiry as the trial court. *Borton & Sons, Inc. v. Burbank Props.*, LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." CR 56(c). We review issues of statutory interpretation de novo. *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 187 Wn.2d 669, 675, 389 P.3d 476 (2017). We also review de novo any interpretations of an insurance contract. *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 710, 375 P.3d 596 (2016). On issues of fact, we view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Owen v. Burlington N. Santa Fe R.R. Co.*, 153 Wn.2d 780, 787, 108 P.3d 1220 (2005).

A. IFCA

Under IFCA,

[a]ny first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action in the superior court of this state to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs.

RCW 48.30.015(1). IFCA vests a cause of action with first-party claimants, defined as "an individual, corporation, association, partnership, or other legal entity asserting a right to payment as a covered person under an insurance policy." RCW

48.30.015(4); *Trinity Universal Ins. Co. of Kansas v. Ohio Cas. Ins. Co.*, 176 Wn. App. 185, 201, 312 P.3d 976 (2013).

IFCA claims are similar to insurance bad faith claims and insurance-related CPA claims, *Seaway Props., LLC v. Fireman's Fund Ins. Co.*, 16 F. Supp. 3d 1240, 1252-53 (W.D. Wash. 2014), and some insurance bad faith and IFCA claims could overlap. *Beasley v. GEICO*, 23 Wn. App 2d 641, 668, 517 P.3d 500 (2022). But an IFCA claim must be based on either the unreasonable denial of coverage, or the unreasonable denial of benefits owed under the policy. *Id.*

Both Phillip and CDIC appeal several of the trial court's orders concerning CDIC's liability under IFCA.

1.  The trial court did not err in holding CDIC liable under IFCA as a matter of law for its unreasonable refusal to pay $1 million in indemnity proceeds after its insureds were adjudged liable for an amount well in excess of the indemnity limits

CDIC appeals the trial court's determination that it is liable as a matter of law under IFCA for failing to pay the policy benefits of $1 million after the court confirmed the arbitration award. We disagree and affirm this ruling.

CDIC's policy stated that CDIC "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." CDIC did not dispute that its insureds became legally obligated to pay $10.6 million in damages once the arbitration award was confirmed and that this claim was covered under the indemnity provision of the policy.

The trial court ruled "CDIC is liable under IFCA for unreasonable failure to pay the policy benefits of $1 million toward the July 31, 2018 arbitration award." We agree. CDIC lacked any rational justification for its nonpayment of policy limits once its insureds' liability had been adjudicated.

The July 31, 2018 arbitration award established its insureds' liability for Phillip's damages in the amount of $10,608,092. The arbitration award established the amount CDIC's insureds legally owed as damages to Phillip. Under the Restatement (Second) of Judgments § 84 (Am. Law Inst. 1982), a valid and final arbitration award has the same effect under the rules of res judicata as a judgment of a court. *See Fisher v. Allstate Ins. Co.*, 136 Wn.2d 240, 252 n.6, 961 P.2d 350 (1998) ("authority exists for not requiring an arbitration award to be reduced to judgment"); *Chartis Specialty Ins. v. RCI/Herzog*, 2012 WL 2389999 at *8 (W.D. Wash. 2012) (arbitration award triggered insurer's duty to pay liability benefits, even absent confirmation of award or entry of judgment; "Washington courts likely would not allow an insurer to 'escape its obligation' to indemnify simply because the parties to the arbitration have not confirmed the award.").

Because CDIC's insureds were legally obligated to pay in excess of $10.6 million in damages to Phillip once the court confirmed the arbitration award, CDIC's duty to indemnify was triggered and it had no reasonable justification for withholding payment of policy limits at that point. Yet, CDIC did not pay the policy

benefits into the court registry until February 14, 2020, after the trial court ordered it do so.[9]

CDIC argues that it cannot be liable under IFCA because it did not deny coverage or refuse to settle Phillip's claim within policy limits, citing *Perez-Crisantos*, 187 Wn.2d 669. But in that case, our Supreme Court addressed a narrow issue: whether IFCA created a new and independent cause of action for violating insurance regulations in the absence of an unreasonable denial of coverage or benefits. *Id*. 672. The Supreme Court concluded it does not. *Id.* at 680. The Court did not hold, as CDIC contends, that IFCA applies only if an insurer denies coverage altogether or refuses to extend any settlement offer within policy limits.

The plain language of IFCA establishes liability for the unreasonable denial of coverage or the unreasonable failure to pay benefits. If either or both acts are established, a claim exists under IFCA. *Ainsworth v. Progressive Cas. Ins. Co.*, 180 Wn. App. 52, 79, 322 P.3d 6 (2014). The statute clearly contemplates a case, such as this one, in which an insurer acknowledges coverage, but fails to pay benefits when they become legally due under the unambiguous terms of the policy.

Indeed, federal courts in Washington have rejected CDIC's interpretation of *Perez-Crisantos*, recognizing that IFCA's "payment of benefits" prong covers scenarios beyond denials of coverage. *See Heide v. State Farm Mut. Auto. Ins. Co.*, 261 F. Supp. 3d 1104, 1107, n.3 (W.D. Wash. 2017) ("*Perez-Crisantos* cannot

---

[9] Even then, CDIC sought discretionary review of the trial court's order confirming its duty to pay out the $1 million. These funds were not disbursed to Phillip until September 2020.

be reasonably read to displace the decisions holding that unreasonably low offers by an insurer that effectively deny the benefits owed to an insured constitute actionable violations of IFCA"). Federal courts in Washington have recognized claims under the "payment of benefits" prong where an insurer acknowledges coverage and either refuses to pay a specific benefit promised outright or "makes an unreasonably low offer." *Id*. at 1107. These courts have described the benefits to which a first-party insured is entitled under IFCA's "denial of payments of benefits" prong as the "payment of the reasonable expenses or losses incurred as a result of an insured event." *Langley v. GEICO Gen. Ins. Co.*, 89 F. Supp. 3d 1083, 1091 (E.D. Wash. 2015).

> Where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied.

*Id*. at 1091-92.

CDIC also argues that it fully defended its insureds through both of Phillip's personal injury and bad faith lawsuits and made multiple attempts to settle the claims for policy limits, precluding IFCA liability. There are two problems with this argument. First, although the refusal to defend an insured can constitute a "denial of coverage" under IFCA, *Webb v. USAA Cas. Ins. Co.*, 12 Wn. App. 2d 433, 464, 457 P.3d 1258 (2020), Phillip's claim to the $1 million in policy limits was not based on an unreasonable denial of coverage. His claim was instead based on the unreasonable denial of benefits.

Second, CDIC is confusing its contractual duty to defend and settle third-party claims with its contractual duty to its insureds to indemnify them against judgments:

> The two duties are distinct in that the duty to defend arises when a complaint contains any allegations that could make an insurer liable to an insured under the policy, while the duty to indemnify arises when an insured is actually liable to a claimant and that claimant's injury is covered by the language of the policy.

*Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 421 n.7, 191 P.3d 866 (2008).  The trial court did not hold CDIC liable under IFCA for failing to defend its insureds or failing to offer to settle Phillip's claim.  It held CDIC liable because it failed to pay policy proceeds after its insureds were adjudged liable for an amount exceeding those limits.

Finally, CDIC argues that, in holding it liable for failure to pay benefits, the trial court failed to recognize its fiduciary obligation to seek a release of liability. Resp. Br. 106.  CDIC's argument glosses over one key fact: its insureds had been adjudicated liable for Phillip's claim to the tune of $10.6 million.  After the court confirmed the arbitration award, CDIC did offer to pay Phillip policy limits, but it explicitly conditioned payment on the execution of a full release of liability against the insureds.  CDIC maintains that if it had paid out the $1 million at that point, the policy limits would have been exhausted and its insureds would have had no legal representation in any pending actions.[10]

---

[10] When the court confirmed the arbitration award in August 2018, the only lawsuit pending against the insureds was the federal declaratory judgment action that CDIC had initiated against its insureds.  CDIC had no duty to provide a defense to its insureds in that lawsuit.  Although Phillip named Ephrata and Zewdu as defendants in this bad faith action in August 2019, by the time this lawsuit was filed, CDIC's insureds had already executed the assignment agreement with Phillip, who had agreed to assume any legal defense.  We have seen no evidence CDIC ever asked its

The trial court rejected CDIC's justification for refusing to pay benefits to Phillips and held that "CDIC's conduct in conditionally offering the policy benefits for purposes of settlement effectively, and unreasonably, denied benefits owed." We agree. Expecting Phillip to sign a release and to forfeit his right to collect anything from the insureds above the $1 million policy limit, after litigating liability and damages and prevailing, was not reasonable. While an insurer may always ask a claimant for a release, Phillip refused the request and CDIC's insureds remained legally liable for payment of the full damage award.[11] At that point, there was no justification for nonpayment of the policy limits.

The trial court did not err in concluding that CDIC's failure to pay its policy limits after the confirmation of the arbitration award constituted a violation of IFCA as a matter of law.[12]

2. The trial court did not abuse its discretion in holding that CDIC was judicially estopped from claiming that the confirmation of the arbitration award did not trigger its obligation to pay interest on the award

Phillip raised a second IFCA denial of policy benefits claim based on the supplementary payments provision of the CDIC policy.[13] That provision provided:

---

insureds if they wanted to continue to receive a defense from CDIC in lieu of payment of policy proceeds.

[11] CDIC's reliance on *Moratti v. Farmers Insurance Co. of Washington*, 162 Wn. App. 495, 254 P.3d 939 (2011) and *Singh v. Zurich American Insurance Co.*, 5 Wn. App. 2d 739, 428 P.3d 1237 (2018) is misplaced because neither case involved an insurer's failure to pay policy benefits after a court adjudged the insureds liable. Both involved an insurer's bad faith in negotiating settlements before a finding of liability.

[12] The trial court also concluded that CDIC's failure to pay these policy proceeds constituted a violation of the CPA, a breach of its duty of good faith, and a breach of contract, as a matter of law. CDIC does not offer any arguments for reversing this order other than its contention that it acted reasonably in not paying the policy limits. We affirm the trial court's summary judgment order establishing CDIC's liability for bad faith, breach of contract, and a violation of the CPA, based on the nonpayment of the policy proceeds after confirmation of the arbitration award.

[13] An automobile insurance policy typically imposes a duty to defend an insured from a third party's claim, a duty to indemnify the insured on that claim if adjudged liable, and a duty to pay additional benefits known as "supplementary payments." This provision is "[i]n addition to the obligation to

We will pay for the "insured"

(6) All <u>interest on the full amount of any judgment</u> that accrues <u>after entry of the judgment</u> in any "suit" against the "insured" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

(Emphasis added.) CDIC paid no interest on the August 31, 2018 arbitration award for over two years until, on October 14, 2020, CDIC issued a check to Phillip for interest in the amount of $14,241. CDIC claimed that, if it owed interest at all, it only owed interest from August 31, 2018, the date of confirmation, to September 7, 2018, the date it claimed it offered to pay full policy limits to Phillip—for a total period of 7 days.

Both parties sought summary judgment under IFCA for CDIC's nonpayment of interest. Phillip argued that CDIC's failure to pay any interest until October 2020 was an unreasonable denial of benefits under IFCA. CDIC argued it was not liable for the nonpayment of interest because its duty to pay interest had not been triggered. CDIC maintained that "[d]espite having confirmed the arbitration award in their prior suit against Ephrata and Mr. Zewdu, Plaintiffs have never had judgment entered on that award, so there is no basis for any interest to have begun to accrue."

---

indemnify an insured for liability arising out of . . . bodily injury and the duty to defend." WASH. STATE BAR ASS'N, WASHINGTON MOTOR VEHICLE INSURANCE DESKBOOK § 2.6 (1998). These payments "are generally over and above the available limits." *Id.* The CDIC policy provided that, in addition to indemnifying its insured up to the $1 million policy limit, it would also pay the insured up to $2,000 for the cost of any bail bonds required because of the accident, the insureds' reasonable expenses up to $250 a day, any costs taxed in the lawsuit, and interest. The policy explicitly provided that "[t]hese payments will not reduce the Limit of Insurance."

Initially, the trial court granted CIDC's motion, holding that "an IFCA claim premised upon unreasonable failure to pay interest under the terms of the policy fails as a matter of law." On reconsideration, however, the trial court reversed its ruling, finding CDIC judicially estopped from contending that confirmation of the arbitration award was not the entry of judgment under the policy. The court reinstated this IFCA claim and determined it should be decided by a jury at trial.

Judicial estoppel is an equitable doctrine that precludes a party from asserting a position in one court proceeding and later seeking an advantage by taking a clearly inconsistent position in another proceeding. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007). Three core factors guide courts' application of judicial estoppel: (1) whether a party's later position is clearly inconsistent with its earlier position; (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 538-39. We review a trial court's application of the doctrine for abuse of discretion. *Id.* at 538.

The trial court's application of judicial estoppel is based on undisputed facts. On April 9, 2019, seven months after the trial court confirmed the arbitration award in the personal injury lawsuit, Cause No. 17-2-13809-6, Phillip and Ephrata stipulated to the filing of an amended complaint in which Phillip asserted, for the first time, claims against CDIC, Evergreen Adjustment Services, Mack Trucking, and its insurer, State National Insurance Company, without first seeking leave of

the court. Evergreen Adjustment Services moved to dismiss the amended complaint, arguing that Phillip's "claims were fully litigated in the arbitration, the arbitrator's Final Award was confirmed at Plaintiffs' request, and judgment was entered pursuant to [RCW] 7.04A.250(1)."[14] CDIC joined Evergreen's argument.

On August 2, 2019, the trial court agreed with this argument and dismissed Phillip's amended complaint in No. 17-2-13809-6. It reasoned:

> The confirmed arbitration award was a final determination of all claims against all parties then pending. A judgment on the award would be appropriate. See RCW 7.04A.250. Entry of judgment upon a confirmed arbitration [award] is a ministerial act. . . . Plaintiffs acknowledge that a "confirmed arbitration award is the equivalent of a judgment."
>       . . . .
> Consistent with the policy of promoting finality of judgments, once judgment has been entered in a case, a motion to amend the complaint can only be entertained if the judgment is first reopened under a motion brought under Civil Rules 59 or 60. . . . For these same reasons, Plaintiffs' filing of the Second Amended Complaint in this case seven months after confirmation of the arbitration award was improper.

Phillip argued that the position CDIC advanced in the personal injury action to obtain this order of dismissal was contrary to the argument on which CDIC relied for its refusal to pay interest. The trial court agreed, finding:

> CDIC is judicially estopped from arguing that the confirmation of the arbitration award on August 31, 2018 in Cause Number 17-2-13809-6 (Dkt. #224, Exhibit 14) is not entry of a final judgment within the meaning of the policy. CDIC took the position in Cause Number 17-2-13809-6 that the order of confirmation <u>was</u> entry of a final judgment. (Dkt. #224, Exhibit 15). This position was its primary point to support the relief it sought, and its briefing contains numerous explicit examples of its position. . . . Judge Scott adopted CDIC's position when ruling that Plaintiffs could not amend their complaint in that action because final judgment had been entered. (Dkt. #224,

---

[14] RCW 7.04A.250(1) states "Upon granting an order confirming, vacating without directing a rehearing, modifying, or correcting an award, the court shall enter a judgment in conformity with the order."

Exhibit 16). The Court granted relief to CDIC based on its position. CDIC benefitted from its position when it obtained the relief it sought. Further, Plaintiffs changed position based on these events including by accepting the completion of the case in Cause Number 17-2-13809-6 and instituting the present action based on Judge Scott's determination. CDIC would derive an unfair advantage and Plaintiffs would suffer an unfair detriment if CDIC is not estopped. . . . The Court notes that the attempted change in position is not subtle, but directly contrary to its prior position. Judicial estoppel is appropriate. CDIC may not successfully argue that the obligation to pay never arose due to lack of entry of judgment. Confirmation of the arbitration award was entry of judgment supporting coverage and payment of Supplemental Payments.

CDIC contends it did not take an inconsistent position in the personal injury lawsuit, that the first court did not "accept" any of the arguments it did make, and that its argument did not lead to an unfair advantage to CDIC or impose an unfair detriment on Phillip. We reject each argument.

First, the trial court did not abuse its discretion in finding that CDIC took inconsistent positions regarding the legal effect of the confirmed arbitration award in the two lawsuits. In Phillip's personal injury action, No. 17-2-13809-6, CDIC joined Evergreen's argument that Phillip could not add them as named defendants in that action because the confirmed arbitration award was analogous to a final judgment. In Phillip's bad faith action, CDIC argued that it did not owe interest because no judgment was entered in the personal injury action. These positions are clearly inconsistent, satisfying the first prong of *Arkison*.

Second, the trial court did not abuse its discretion in finding that CDIC's inconsistent argument was "accepted" by the trial court in the personal injury action. CDIC argues that while the court stated that "judgment on the award *would be appropriate*," it did not hold that judgment had actually been entered. CDIC's

- 21 -

argument is not supported by the record. The trial court made clear that, consistent with CDIC's position, it considered the arbitration confirmation to be the same as a final judgment. This legal argument, advanced by Evergreen and joined by CDIC, was "accepted" by the trial court; it was the basis for its dismissal of that lawsuit.

Finally, the trial court did not abuse its discretion in finding that CDIC derived an unfair advantage from taking inconsistent positions in the two lawsuits. In the personal injury action, CDIC achieved its goal—dismissal of Phillip's lawsuit. Phillip had to initiate a separate lawsuit as a direct result of the dismissal order.

CDIC contends its inconsistency between lawsuits did not impose an unfair detriment on Phillip because the language of the supplementary payment provision clearly stated that the duty to pay interest triggered only upon entry of a judgment, and confirmation of an arbitration award was not the entry of a judgment. But CDIC's argument is circular—it is relying on the same legal argument it is judicially estopped from advancing to defeat the finding of judicial estoppel.[15]

The trial court did not abuse its discretion in finding that CDIC is judicially estopped from arguing that the confirmed arbitration award was not a judgment. It

---

[15] We also note that the word "judgment" is not defined in CDIC's policy. This familiar legal word means more than a piece of paper bearing the label "judgment." Black's Law Dictionary defines the term as

> A court's final determination of the rights and obligations of the parties in a case. The term *judgment* includes an equitable decree and any order from which an appeal lies.

BLACK'S LAW DICTIONARY 1007 (11th ed. 2019); *see also Krueger v. Tippett*, 155 Wn. App. 216, 225, 229 P.3d 866 (2010) (approving dictionary definition of judgment). The confirmed arbitration award fits this definition.

necessarily follows from this ruling that the duty to pay interest was triggered by the confirmation of the award.

3. The trial court did not err in determining that under CDIC's policy, it owed interest at the rate of seven percent, but erred in holding that interest continued beyond the date CDIC deposited its policy limits into the registry of the court

The parties both challenge the trial court's calculation of interest owed by CDIC under the policy. Phillip argues he was entitled to interest at the rate of 12 percent, rather than the 7 percent rate applied by the trial court. CDIC maintains the trial court erred in running interest past the date it deposited the policy limits into the registry of the court. We address each argument in turn.

(a) Interest Rate

Phillip contends that CDIC's failure to pay interest on the arbitration award at the rate of 12 percent—the rate to which he and the insureds agreed in the March 2019 assignment agreement—was a breach of the policy, breach of its duty to indemnify, and a violation of IFCA. CDIC maintains the trial court correctly concluded that the policy required it to pay interest at the rate for tort judgments. For the purposes of Phillip's breach of contract and IFCA claims, we agree with CDIC.

Phillip relies on *Jackson v. Fenix Underground, Inc.*, 142 Wn. App. 141, 146, 173 P.3d 977 (2007) and *Hamblin v Castillo Garcia*, 9 Wn. App. 2d 78, 91, 441 P.3d 1283 (2019) for the basic proposition that "[o]nce parties have agreed to settle a tort claim, the foundation for the judgment is their written contract, not the underlying allegations of tortious conduct." But both were third-party failure to settle cases, not first-party IFCA nonpayment of policy benefits cases.

In *Fenix Underground*, a patron sued a nightclub after incurring a knee injury when pushed to the ground by a security guard. 142 Wn. App. at 143. The club tendered the claim to its carrier, Scottsdale, which offered to settle for what it contended was the policy limit of $50,000. *Id.* The injured patron and the club agreed to settle the case without the insurer's approval by entry of a covenant judgment for $275,000 and postjudgment interest at 12 percent, subject to a finding of reasonableness under *Chaussee v. Maryland Casualty Co.*, 60 Wn. App. 504, 803 P.2d 1339, 812 P.2d 487 (1991). *Fenix Underground*, 142 Wn. App. at 143-44. The trial court found the settlement reasonable, but reduced the interest rate from 12 percent to 7.18 percent, the then rate for judgments founded on the tortious conduct of individuals under RCW 4.56.110(3). *Id.* at 144-45.

This court reversed, holding that when a trial court approves a settlement as reasonable, it is necessarily finding reasonable all amounts to be paid, including the agreed-upon interest rate. *Id.* at 146. The court rejected the insurer's argument based on the language of RCW 4.22.060 that only the principal amount of the settlement, and not the interest, should be viewed as the "amount to be paid." *Id*. The court held, "[b]oth principal and interest [were] components of the settlement. A plaintiff may be willing to accept a smaller principal amount if the interest rate on the outstanding balance is higher, and vice versa." *Id.* Because the parties had the freedom to choose varying interest rates depending on their circumstances, that interest became a part of the settlement amount to be paid and "the court does not have authority to adjust the specified interest rate once the court has determined that the amount to be paid is reasonable. *Id.* at 147.

Ultimately, judgment was entered in that case, not based on the alleged tortious conduct, but on the parties' settlement agreement, triggering RCW 4.56.110(1). *Id.* at 146.

In *Hamblin*, after an alcohol-impaired motorcycle driver's insurer refused to settle with an injured plaintiff for policy limits, the injured plaintiff and the insured reached a settlement agreement, in which they stipulated to a $1.5 million judgment and postjudgment interest of 12 percent. 9 Wn. App. 2d at 83, 91. The plaintiff agreed not to enforce any excess judgment against the insured's assets, other than his rights against his insurer. *Id.* at 83. The parties also agreed that the insured would receive 10 percent of any global settlement between the injured plaintiff and the insurer. *Id.* at 90.

At a reasonableness hearing, the trial court found the settlement reasonable and entered a covenant judgment against the insured for the settlement amount, but imposed postjudgment interest at a rate of 6.5 percent based on the statutory rate contained in RCW 4.56.110(3)(b).[16] *Hamblin*, 9 Wn. App 2d at 84. The insurer appealed the finding of reasonableness. Hamblin appealed the postjudgment interest rate.

This court concluded that the structure of the settlement, with a guarantee of payment to the insured from a subsequent settlement with the insurer, was unreasonable and, because of a severability clause, could be stricken from the agreement without requiring the entire agreement to be rejected. *Id.* at 90, 92. It

---

[16] RCW 4.56.110(3)(b) states "judgments founded on the tortious conduct of individuals or other entities . . . shall bear interest from the date of entry at two percentage points above the prime rate, as published by the board of governors of the federal reserve system."

also concluded that because the trial court found the remaining provisions of the settlement agreement reasonable, it erred in refusing to apply the contracted interest rate of 12 percent. As in *Fenix Underground,* we held that RCW 4.56.110(1)—providing that judgments founded on written contracts bear the contractual rate—controlled. *Id.*

This case differs from both *Fenix Underground* and *Hamblin.* First, Phillip's IFCA claim depends, not on what he and the insureds agreed after the entry of the adverse arbitration award, but the benefits CDIC was contractually obligated to pay its insureds under the policy. The supplementary payment provision links CDIC's liability for interest to its insureds' liability for interest arising out of a judgment. Here, the judgment is the confirmed arbitration award, not the settlement agreement between its insureds and Phillip.

Second, the foundation for the arbitration award was not a negotiated settlement found by a trial court to be reasonable under *Chaussee.* At arbitration, the parties disputed the extent of Phillip's contributory fault and the nature and extent of his traumatic brain injury. The arbitration award contained findings of fact resolving these disputes and made no ruling as to the reasonableness of postjudgment interest at 12 percent.

After Phillip obtained an order confirming the award, he, Ephrata, and Zewdu negotiated their settlement agreement, but no one sought a reasonableness hearing on that agreement and no trial court has found that the settlement, with the 12 percent interest rate, is reasonable under *Chaussee.* Under this set of circumstances—where the final amount awarded to the injured

plaintiff is the result of an adversarial proceeding, whether trial or arbitration, and there is no finding of reasonableness of the overall structure of a settlement to include the agreed-upon interest rate—RCW 4.56.110(3)(b) controls. The trial court did not err in holding CDIC liable for the lower interest rate of 7 percent under that statute.[17] And we conclude, as a matter of law, that CDIC did not violate IFCA, or its duty to indemnify under the policy, by refusing to pay interest at the higher 12 percent rate.

(b) Interest Period

CDIC further contends the trial court erred in calculating the duration of time interest ran under the terms of the policy. We agree with CDIC's argument, but only in part.

The trial court confirmed the arbitration award on August 31, 2018. On January 29, 2020, CDIC obtained court permission to deposit the $1 million policy limits into the registry of the court. CDIC notified the parties and the court that it had made this deposit on February 14, 2020. On September 21, 2020, the court granted Phillip's motion for a disbursement of the proceeds from the court registry. The clerk paid the funds to Phillip on October 2, 2020.

On October 14, 2020, CDIC issued a check to Phillip for interest in the amount of $14,241, based on its computation of interest. It claimed interest was owed from August 31, 2018, the date of confirmation, to the date it claimed it offered to pay full policy limits to Phillip on September 7, 2018. The trial court

---

[17] In this case, the parties agree that the prime rate in July 2018 was five percent, thus yielding the seven percent statutory rate imposed by the trial court.

subsequently held CDIC liable for interest from August 31, 2018 to October 2, 2020. It computed interest at $2,034.41 per day for 762 days, less $14,241 CDIC had already paid in interest.

CDIC argues the trial court erred in applying the supplementary payments provision of its policy, which provides that the duty to pay interest "ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance." CDIC first contends its duty to pay interest ended on September 7, 2018, when it offered to pay policy limits to settle Phillip's claims. We disagree with this argument.

Under *Jones v. Best*, 134 Wn.2d 232, 950 P.2d 1 (1998), our Supreme Court held that "tender of the amount due must be unconditional in order to stop interest from running." *Id.* at 243. CDIC's September 7, 2018 offer stated:

> Now that Judge McDermott has issued his arbitration award in the above matter, [CDIC] has asked and authorized me to again extend the full $1 million "per accident" coverage limit provided by the above-referenced insurance policy issued to Ephrata Trucking LLC. [CDIC] makes this offer in exchange for a release and full and final settlement of your clients' claims in the above matter against any and all insureds.

This offer was not an unconditional tender of the amount due to Phillip. It was conditioned on Phillip's execution of a release against the insureds, despite the fact that he had just obtained an arbitration award in excess of $10 million against them. The September 7, 2018 letter did not toll the accrual of postjudgment interest under *Jones*.

CDIC argues that *Jones* is distinguishable because that case involved the accrual of prejudgment, as opposed to postjudgment, interest, and involved a

commercial dispute, rather than an insurance policy. Although *Jones* arose in a different context, that difference alone is not a material one. The purpose of interest, whether imposed prejudgment or postjudgment, is to compensate the claimant or judgment creditor for the "use value" of money. *Hill v. Garda CL NW, Inc.*, 191 Wn.2d 553, 573, 424 P.3d 207 (2018). The only legal difference between the two is that postjudgment interest is statutorily mandated in Washington, *Rufer v. Abbott Laboratories*, 154 Wn.2d 530, 553, 114 P.3d 1182 (2005), whereas prejudgment interest is awardable only if the damages awarded are liquidated. *Dep't of Corrs. v. Fluor Daniel, Inc.*, 160 Wn.2d 786, 789, 161 P.3d 372 (2007). Additionally, CDIC's decision to condition payment of its policy limits on the execution of a release, even though its insureds had already been adjudged liable for a sum in excess of that amount, violated IFCA, and the trial court properly rejected the date of this bad faith offer as the date postjudgment interest ceased.

CDIC alternatively argues that its duty to pay interest ended when it obtained court permission to deposit the policy proceeds into the court registry. With this interpretation of the policy, we agree. The plain terms of the policy provide that CDIC's duty to pay interest ends when it deposits funds into the court registry. CDIC obtained court approval to take this step. We thus conclude that the trial court erred in running interest through October 2, 2020. Interest ceased to accrue under CDIC's policy on February 14, 2020.

We affirm the imposition of interest at 7 percent and affirm the dismissal of any IFCA claim based on CDIC's nonpayment of 12 percent interest. We reverse

the judgment against CDIC and remand to the trial court to recompute interest consistent with this opinion.

4. The trial court did not err in denying both parties' summary judgment motions on Phillip's claim that the nonpayment of interest constitutes an unreasonable denial of benefits in violation of IFCA

CDIC next contends the trial court erred in ruling that a jury should determine whether its nonpayment of interest for two years constitutes an unreasonable denial of benefits in violation of IFCA. Phillip argues he is entitled to judgment on this IFCA claim as a matter of law. We disagree with both CDIC and Phillip and affirm the trial court's decision that the reasonableness of CDIC's actions should be resolved by a jury.

An insurer is entitled to summary judgment of a policyholder's IFCA claim only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances and the insurer is entitled to prevail as a matter of law. *Am. States Ins. Co. v. Symes of Silverdale, Inc.*, 150 Wn.2d 462, 470, 78 P.3d 1266 (2003). The Supreme Court set out the summary judgment standard in *Smith v. Safeco Insurance Co.*, 150 Wn.2d 478, 486, 78 P.3d 1274 (2003):

> If the insured claims that the insurer denied [benefits] unreasonably in bad faith, then the insured must come forward with evidence that the insurer acted unreasonably. The policy holder has the burden of proof. The insurer is entitled to summary judgment if reasonable minds could not differ that its denial of [benefits] was reasonable, or if there are material issues of fact with respect to the reasonableness of the insurer's action, then summary judgment is not appropriate. If the insurer can point to a reasonable basis for its action, this reasonable basis is significant evidence that it did not act in bad faith and may even establish that reasonable minds could differ that its denial of [benefits] was justified. However, the existence of some theoretical reasonable basis for the insurer's conduct does not end

the inquiry. The insured may present evidence that the insurer's alleged reasonable basis was not the actual basis for its action, or that other factors outweighed the alleged reasonable basis.

Here, Phillip claimed CDIC acted in bad faith and unreasonably in refusing to pay interest on the arbitration award at the rate of 12 percent and in refusing to pay interest for the period of time after CDIC made its conditional offer to pay policy limits in September 2018. As to the interest rate, because we conclude CDIC did not act unreasonably in refusing to pay the higher rate, we reject this claim. To the extent the summary judgment order concluded that the reasonableness of CDIC's application of the 7 percent rate should be resolved by a jury under IFCA, we reverse that ruling and conclude summary judgment should have been entered for CDIC.

As to whether CDIC acted unreasonably in paying Phillip postjudgment interest only through September 18, 2018, we agree with the trial court that the reasonableness of this conduct is one for a jury to decide. First, CDIC cannot rely on the lack of the entry of a final judgment as a basis for its calculation as it is judicially estopped from doing so. Second, the calculation was based on a misreading of the law that its conditional offer to pay policy limits ended the accrual of interest. Third, WAC 284-30-330(7) provides that an insurer may not compel a first-party claimant to initiate litigation to recover amounts due under an insurance policy by offering substantially less than the amount ultimately recovered in that action or proceeding. The denial of payment of benefits may constitute a violation of WAC 284-30-330(7). A violation of WAC 284-30-330(7) constitutes evidence of unreasonableness under IFCA, and a per se unfair trade practice under RCW

19.86.170. *Perez-Crisantos*, 187 Wn.2d at 685 (quoting *Indus. Indem. Co. of NW, v. Kallevig*, 114 Wn.2d 907, 792 P.2d 520 (1990)).

There is an implied reasonableness requirement in WAC 284-30-330(7) and thus to prevail on this claim, Phillip must show that CDIC lacked a reasonable justification for making the small interest payment it made. *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 699-700, 17 P.3d 1229 (2001). The difference between the amount offered and the final award alone is insufficient to show that an insurer acted in bad faith. *Keller v. Allstate Ins. Co.*, 81 Wn. App. 624, 633-34, 915 P.2d 1140 (1996). Rather, the issue turns on whether the insurer had reasonable justification for its low offer. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 336, 2 P.3d 1029 (2000).

There is a large disparity between the amount of interest CDIC chose to pay ($14,241) and the amount we conclude is owing under the policy (interest from August 31, 2018 to February 14, 2020). And CDIC delayed paying any interest for over two years. After CDIC issued its interest payment, Phillip (as assignee of the insureds) had to file a summary judgment motion to resolve the interest dispute. Richard Dykstra, Phillip's insurance claims handing expert, testified that CDIC acted unreasonably in deciding that its interest obligation ended on September 7, 2018. A jury could find that CDIC forced Phillip to resolve the interest dispute through litigation by making an unreasonably low interest payment some two years after it acknowledged interest was due. We affirm the trial court's denial of summary judgment on this aspect of Phillip's IFCA claim.

5.  The trial court erred in concluding that CDIC's insureds failed to present evidence of actual damages under IFCA

Phillip challenges the trial court's ruling that CDIC's insureds cannot establish any injury or actual damages under IFCA proximately caused by the insurer's failure to pay the $1 million in indemnity benefits. We agree because there is sufficient evidence in the record to create an issue of fact on causation and actual damage.

IFCA requires proof that the unreasonable denial of benefits caused the insured "actual damages," which includes noneconomic damages. *Beasley,* 23 Wn. App. 2d at 665. Phillip first contends that because CDIC's IFCA conduct also constituted the tort of bad faith, the insureds are entitled to a presumption of harm. But Phillip's argument is conflating the remedies available to him under IFCA and the remedies available when an insurer fails to settle a third-party claim in bad faith.

Under our bad faith failure to settle case law, an insurer has a duty of good faith to deal fairly with its insured, meaning it must give equal consideration to the interests of its insureds and its own interests and must not engage in any action that demonstrates a greater concern for its own financial interests than those of its insured. 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 320.02 (7th ed. 2019). For instance, if an insurer refuses to settle a third-party claim on its insured's behalf in bad faith, the insured may independently negotiate a settlement. *Gosney v. Fireman's Fund Ins. Co.*, 3 Wn. App. 2d 828, 853, 419 P.3d 447 (2018). In such a case, the insurer is liable for the settlement to the extent the settlement is reasonable and paid in good faith. *Besel v. Viking*

- 33 -

*Ins. Co. of Wis.*, 146 Wn.2d 730, 736, 49 P.3d 887 (2002) (citing *Evans v. Cont'l Cas. Co.*, 40 Wn.2d 614, 628, 245 P.2d 470 (1952)). A presumption of harm arises if bad faith is established. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 390, 823 P.2d 499 (1992). These settlement agreements typically involve three features: (1) a stipulated or consent judgment between the plaintiff and the insured; (2) a covenant not to execute on that judgment; and (3) an assignment to the plaintiff of the insured's bad faith claims against the insurer. *Bird v. Best Plumbing Grp. LLC*, 175 Wn.2d 756, 764-65, 287 P.3d 551 (2012). As with a settlement that is reasonable and paid in good faith such as in *Evans*, the amount of the covenant judgment is the presumptive measure of the insured's harm caused by an insurer's tortious bad faith if the covenant judgment is reasonable under the criteria described in *Chaussee*. *Besel*, 146 Wn.2d at 738.[18]

If the court deems the stipulated covenant judgment to be reasonable, it becomes the presumptive measure of damages in a later bad faith action against the insurer. *Bird*, 175 Wn.2d at 765. And an insured can recover from the insurer the amount of judgment rendered against the insured, even if the judgment exceeds contractual policy limits. *Gosney*, 3 Wn. App. 2d at 854. An insurer may rebut the presumptive measure by showing the settlement was the product of fraud or collusion. *Id.*

But these remedies available for claims of insurance bad faith are not the same as the remedies available under IFCA. *Beasley*, 23 Wn. App. 2d at 667.

---

[18] *Chaussee* adopted for determination of the reasonableness of these settlements the factors established in *Glover for Cobb v. Tacoma General Hospital*, 98 Wn.2d 708, 717-18, 658 P.2d 1230 (1983), abrogated by *Crown Controls, Inc. v. Smiley*, 110 Wn.2d 695, 756 P.2d 717 (1988), which were originally established to assess the reasonableness of settlements subject to RCW 4.22.060.

Although some bad faith and IFCA claims could overlap, an insured's damages could differ. *Id.* at 668  IFCA establishes its own statutory remedies that apply when IFCA liability is triggered by an unreasonable denial of coverage or payment of benefits.  These remedies include "actual damages sustained," together with costs, reasonable attorney fees, and permissive treble damages.  RCW 48.30.015(1)-(3).

The relief available under IFCA is a question of legislative intent.  *Beasley*, 23 Wn. App. 2d at 659.  In *Beasley*, the court held both that "IFCA damages must be caused by" the denial of coverage or payment of benefits at issue, and that IFCA damages and bad faith damages cannot be assumed to be the same in a given matter because the liability standards for bad faith embrace a wider range of insurer conduct than the more specific grounds for IFCA liability.  *Id*. at 667.  Phillip points to no statutory language or legislative history that would suggest that IFCA meant to import the common law remedies developed for bad faith, and we cannot conclude that this was intended where IFCA specifies the "independent, but not exclusive" remedies it allows.  *Id*. at 662.  We therefore reject Phillip's contention, and conclude that neither the presumption of harm recognized in *Butler*, nor the presumptive measure of harm recognized in *Besel* applies to the insureds' claim for the unreasonable denial of policy benefits under IFCA.

Nevertheless, Phillip presented evidence through expert testimony that Ephrata and Zewdu suffered actual damages as a result of CDIC's failure to pay the indemnity limits when the arbitration award was confirmed.  First, Dykstra, testified that had CDIC paid Phillip the $1 million in September 2018, it would have

reduced the unpaid portion of the award and thus the insureds' exposure for interest on the remaining amount. Second, both insureds faced the risk that Phillip would execute against their assets, including Ephrata's trucking permit. The insureds felt they had no alternative but to then negotiate with Phillip to avoid personal and corporate bankruptcy and to delay execution against Ephrata's assets. Because they could not force CDIC to pay Phillip any insurance proceeds, they negotiated a settlement in which they agreed to pay interest at a rate of 12 percent (higher than would have applied under RCW 4.56.110(3)(b)) in exchange for Phillip's agreement to delay any execution of a judgment against Ephrata and not to execute on Zewdu's personal assets once all applicable insurance benefits and limits have been paid. They agreed:

> As delay in entry of or personal execution on the arbitration award is beneficial to the Defendants but detrimental to Plaintiffs, it is agreed as further consideration that the unpaid portions of the award shall accrue interest at 12% compounded per annum from April 10, 2017 until paid.

Even if CDIC did not violate IFCA or breach the insurance policy by refusing to pay post-award interest at a rate of 12 percent, it may still be held liable for the delta between the contractual interest rate of 7 percent and the settlement interest rate of 12 percent if a jury finds that, but for CDIC's refusal to pay the $1 million in policy benefits between September 2018 and March 2019, the insureds would not have had to agree to pay Phillip this higher interest rate to protect their corporate and

personal assets. Finally, Zewdu testified that he suffered emotional distress as a result of CDIC's refusal to pay proceeds from the policy.[19]

We reverse the trial court's summary judgment ruling and conclude that Phillip presented sufficient evidence of actual damages to warrant a trial on his IFCA claims.

> 6. The trial court erred in denying Phillip's motion for an award of attorney fees under *Olympic Steamship,* IFCA, and the CPA

Phillip also assigns error to the trial court's denial of his motion for attorney fees incurred to recover the unpaid policy limits under *Olympic Steamship*, IFCA, and the CPA. We conclude that Phillip is entitled to an award of fees.

Whether a party is entitled to attorney fees is an issue of law we review de novo. *King County v. Vini Const. Grands Projets*, 191 Wn. App. 142, 183, 364 P.3d 784 (2015).

Under *Olympic Steamship,* an insured is entitled to an award of attorney fees in any legal action where the insurer compels the insured to assume the burden of legal action or to obtain the full benefit of their insurance contract, regardless of whether the insurer's duty to defend is at issue. *Olympic Steamship*, 117 Wn.2d at 53. "[A]n insured is entitled to attorney fees if the insured litigates an issue of coverage, but not if the issue is merely a dispute about the value of a claim." *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 147, 930 P.2d 288 (1997). "Coverage disputes include both cases in which the issue of any

---

[19] CDIC argued below and on appeal that an insurer cannot be liable for emotional distress damages caused by its IFCA violation, citing *Schreib v. American Family Mutual Insurance Co.*, 129 F. Supp. 3d 1129, 1141 (W. D. Wash. 2015). But this court has recently held that an IFCA plaintiff may recover noneconomic damages such as emotional distress. *See Beasley*, 23 Wn App. 2d at 661; *Hamblin*, 9 Wn. App. at 91; *Singh*, 5 Wn. App. 2d at 759-60.

coverage is disputed and cases in which 'the extent of the benefit provided by an insurance contract' is at issue." *Id*. (quoting *McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26, 33, 904 P.2d 731 (1995). Assignees of the insured may also recover fees if they are compelled to sue an insurer to secure coverage. *Trinity Universal*, 176 Wn. App. at 208.

In *Little v. King*, 147 Wn. App. 883, 890-91, 198 P.3d 525 (2008), this court held that an insured is entitled to fees where the insurer argued below that it had no obligation to pay interest on a judgment against the insured. As in that case, CDIC also argued below that it did not owe interest under its policy's supplementary payments provision. Because Phillip, as the insured's assignee, was forced to file suit in order to obtain benefits owing under the supplementary payments provision, he is entitled to an award of fees under *Olympic Steamship*.

Phillip also sought attorney fees under IFCA and the CPA. RCW 48.30.015(3) states that "[t]he superior court shall, after a finding of unreasonable denial of a claim for coverage or payment of benefits . . . award reasonable attorneys' fees." RCW 19.86.090 states that "[a]ny person who is injured . . . by a violation of [the CPA]" is entitled to an award of reasonable attorney fees. An award of attorney fees is mandatory for prevailing plaintiffs in private actions. *Perez-Cristanos,* 187 Wn.2d at 672 (IFCA); *State v. Black*, 100 Wn.2d 793, 805, 676 P.2d 963 (1984) (CPA). Because we affirm the trial court's determination that CDIC unreasonably denied the payment of benefits by withholding policy limits after its insureds were adjudicated liable for an amount in excess of those limits,

Phillip is entitled to an award of attorney fees under IFCA and the CPA for those fees he incurred to compel CDIC to pay him the policy proceeds.

B. Bad Faith

Both parties assign error to the trial court's rulings on Phillip's multiple bad faith claims. Phillip argues that the trial court erred in ruling on summary judgment that CDIC acted reasonably and in good faith in declining to disclose coverage limits one month after the accident. And CDIC argues that the trial court erred denying its motion for partial summary judgment on the reasonability of the timing of its first settlement offer. Finally, Phillip also contends the trial court erred in concluding that CDIC's insureds produced no evidence that they were harmed by any of the acts or omissions of CDIC. We address each claim in turn.

Insurers in Washington have a duty to act in good faith and to deal fairly with their insureds. *Smith*, 150 Wn.2d at 484; RCW 48.01.030 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters."). A violation of this duty gives rise to a common law tort cause of action for bad faith. *Smith*, 150 Wn.2d at 484. An insured's assertion of bad faith against an insurer is a tort claim. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 389, 823 P.2d 499 (1992). To establish bad faith, an insured must prove that the insurer owed a duty, that it breached this duty, that the breach was "unreasonable, frivolous, or unfounded," and that the breach proximately caused the insured damages. *Overton* v. *Consol. Ins. Co.*, 145 Wn.2d 417, 433, 38 P.3d

322 (2002); *Mutual of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 161 Wn.2d 903, 916, 169 P.3d 1 (2007); *Smith*, 150 Wn.2d at 485.

Phillip argued below that CDIC engaged in bad faith in multiple ways, including (1) refusing to disclose its insureds' policy limits to Phillip without first consulting its insureds to determine if the insureds deemed such an early disclosure to be in their best interest; (2) unreasonably delaying to settle for policy limits until a time when it was clear Phillip would not agree to that offer and then refusing to allow the insureds to settle at mediation without a full release of liability; (3) failing to conduct a prompt, full and fair investigation into all available insurance coverage and other potential defendants to reduce its insureds' exposure; (4) failing to fully investigate whether it had first-party PIP coverage for Phillip, as a pedestrian; and (5) failing to pay the indemnity limits and interest under the policy once the arbitration award was confirmed.

As discussed above, the trial court held CDIC liable as a matter of law for bad faith in refusing to pay the indemnity limits. As for the remaining claims, the trial court dismissed some of them on their merits and determined some of them should be resolved by a jury. Later, however, the trial dismissed all remaining bad faith claims, finding that Phillip could not establish that the alleged errors or omissions by CDIC proximately caused the insureds any harm or damages.

Both Phillip and CDIC assign error to various summary judgment orders relating to specific bad faith claims.

1. The trial court erred in dismissing Phillip's bad faith claim relating to CDIC's refusal to disclose its insureds' policy limits without consulting with its insureds

Phillip argues the trial court erred in ruling on summary judgment that CDIC did not act in bad faith by declining to disclose the coverage limits of its insurance policy to Phillip, prior to this lawsuit, without first consulting with the insureds. We agree and reinstate this claim.

Insurers have a duty to forebear from placing their own financial interests before the interest of its insured. *Mut. of Enumclaw Ins. Co. v. T&G Const., Inc.*, 165 Wn.2d 255, 269, 199 P.3d 376 (2008). An insurer must also give equal consideration to the insured's interests as it gives to its own, *Butler*, 118 Wn.2d 383 at 389, and may not negotiate with a claimant in a way that safeguards its own interests while neglects those of its insureds. *Singh v. Zurich Am. Ins. Co.*, 5 Wn. App. 2d 739, 749, 428 P.3d 1237 (2018).

Phillip contends CDIC owed its insureds a duty to consult with its insureds about disclosing policy limits to Phillip when he requested that information. The trial court found on summary judgment that CDIC "acted reasonably and in good faith when it declined to disclose the coverage limits of its insurance policy to Plaintiff's counsel only 31 days after the accident." We reverse this finding on summary judgment.

Whether an insurer acted reasonably or in bad faith is generally a question of fact. *Van Noy v. State Farm Mut. Auto. Ins. Co.*, 142 Wn.2d 784, 796, 16 P.3d 574 (2001). If the insurer can point to a reasonable basis for an action, this explanation is evidence that it did not act in bad faith. *Smith*, 150 Wn.2d at 486. But the insured may present evidence that the insurer's alleged basis was not the actual reason for its action, or that other factors outweighed the alleged reasonable

basis. *Smith*, 150 Wn.2d at 486. Summary judgment is appropriate only if there are no disputed material facts pertaining to the reasonableness of the insurer's conduct under the circumstances. *Kallevig*, 114 Wn.2d at 920. If rational minds could differ that the insurer's conduct was reasonable, or if there are material issues of fact with respect to the reasonableness of the insurer's action, then summary judgment is not appropriate. *Smith*, 150 Wn.2d at 485-86.

In this case, on May 11, 2017, counsel for Phillip sent a letter to CDIC requesting disclosure of its insureds' policy limits. On May 19, 2017, CDIC responded, refusing this request because "[a]t this time [CDIC is] unable to determine if disclosure [of] our insured's policy limits is in our insured's best interest," citing *Smith v. Safeco Ins.*, 112 Wn. App. 645, 50 P.3d 277 (2002). CDIC relied on *Smith* in obtaining summary judgment below.

But *Smith* reveals how fact-intensive the issue is. In that case, Smith, injured in an accident with Safeco's insured, asked Safeco to disclose its insured's policy limits. The insurer declined to do so because it did not have enough information to conclude the claim exceeded its liability limit and it did not know if its insured would consent or object. 112 Wn. App. at 648. Shortly thereafter, Smith sent documentation supporting her claim and made a demand for full policy limits. *Id.* Safeco disclosed to Smith that the policy limit was $100,000 and it subsequently paid that amount to her. *Id.*

Later that year, the insured settled with Smith and agreed to a partial judgment in the amount of $100,000, a covenant not to execute or enforce the judgment, and an assignment of the insured's bad faith claims. *Id.* at 649. Smith

asserted Safeco had breached a duty of good faith that it owed to her and to its insured by refusing to disclose the insured's policy limits. *Id.* at 649. The claim was dismissed on summary judgment. *Id.*

Division Two of this court affirmed the dismissal of this bad faith claim, holding "the insurer must disclose the insured's policy limits if a reasonable person in the same or similar circumstances would believe that disclosure is in *the insured's* (as opposed to the claimant's) best interest." *Id*. at 653. And "the insurer need not disclose if a reasonable person would believe that disclosure is not in *the insured's* best interest, or if a reasonable person would not know, after reasonably marshalling the facts and evaluating the claim, whether disclosure was or was not in *the insured's* best interests." *Id.* It concluded that "[b]ased only on this record, Smith cannot show, and a rational trier of fact could not find, that Safeco's failure to disclose was so 'unreasonable, frivolous, or unfounded' as not to be 'fairly debatable.' " *Id.* at 654 (quoting *Ellwein v. Hartford Accident and Indem. Co.*, 142 Wn.2d 766, 775-77, 15 P.3d 640 (2001)).

The Supreme Court reversed Division Two, concluding that it applied an incorrect legal standard in determining whether summary judgment for the insurer was appropriate, overruling *Ellwein*'s suggestion that an insured had to prove the insurer had _no_ reasonable basis for its actions. 150 Wn.2d at 486. It did not, however, displace Division Two's formulation of the test regarding the duty to disclose policy limits to an injured claimant before litigation: would a reasonable person in the insured's shoes believe that disclosure was not in the insured's best interest, or if a reasonable person would not know, after reasonably marshalling

the facts and evaluating the claim, whether disclosure was or was not in the insured's best interest?

On this record, there is a genuine issue of fact whether CDIC acted reasonably in deciding to withhold information about its insureds' policy limits without first consulting its insureds. Although CDIC's articulated reason—that it lacked sufficient information to determine if disclosure was in its insureds' best interest—is evidence of its good faith, that evidence is disputed. First, Phillip presented evidence that CDIC has a policy of not sharing its policy with anyone. A reasonable jury could find that CDIC's decision to withhold the policy limits information from Phillip was company policy to avoid a policy limits demand rather than an analysis of whether disclosure would be in the insureds' best interest.

Second, a reasonable jury could conclude that CDIC had sufficient information about its insureds' exposure and the extent of Phillip's injuries to conclude that early disclosure of policy limits and proactive efforts at resolution without litigation would be in the insureds' best interest. By May 3, 2017, eight days before Phillip first requested a disclosure of the policy limits, CDIC knew the contents of the police report describing the incident. It knew Phillip had sustained extensive injuries while walking in a marked crosswalk. It also knew that at least two witnesses reported that Zewdu had run a red light before striking Phillip.

Phillip also presented evidence that on May 17, 2017, Evergreen sent CDIC a status report, in which Evergreen recounted details of a recorded eyewitness statement of Dallas Fawcett, a co-worker of Phillip's. Fawcett told Evergreen that he was standing at the corner waiting for the light to turn, that the pedestrian signal

turned white, and that he stepped off the curb and took three steps into the intersection before Phillip passed him in the marked crosswalk. CDIC also increased its reserves to $500,000 by mid-May 2017.

According to one of Phillip's insurance experts, Robert Dietz, despite having this information from its adjuster when Phillip requested policy limits information, CDIC did not consult its insureds to discuss with them whether to consent to disclose or to refuse to disclose their policy limits. Phillip's second expert in insurance claims handling, Dyskstra, testified that CDIC breached industry standards by failing to consult with its insureds before refusing Phillip's request. Dysktra opined that this decision reflected CDIC's failure to consider in any meaningful way the interest of its insureds.

When viewed in the light most favorable to Phillip, this evidence establishes a question of fact as to whether the decision not to disclose policy limits in May 2017, without consultation with the insured, breached a duty of good faith in the handling of the claim against CDIC's insureds.

CDIC argued below, and the trial court concluded, that Phillip failed to present evidence that CDIC's decision not to disclose policy limits to Phillip within a month of the accident caused the insureds any damage or harm. We disagree with this conclusion as well.

The common law tort of insurance bad faith requires proof of causation and harm before liability can be established. *See Smith*, 150 Wn.2d at 485 ("Claims by insureds against their insurers for bad faith are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately

caused by any breach of duty.") Phillip must therefore present evidence sufficient to create a genuine issue of material fact regarding whether CDIC's insureds suffered actual damages proximately caused by CDIC's failure to disclose policy limits to Phillip without consulting the insureds.

Contrary to the trial court's finding, we conclude Phillip met this evidentiary standard.[20] The evidence indicates that Phillip's request came within a month of the April 10, 2017 accident and before he initiated litigation. Had Phillip and his attorney known at that point that the insureds' limit was $1 million, this disclosure could have led Phillip and his parents to negotiate a policy limits settlement to avoid the delay and expense of litigation with the insureds or CDIC, and could have avoided the $10 million arbitration award. As one CDIC witness acknowledged, the risk of not disclosing policy limits to a claimant is that "you may miss an opportunity to settle for within the policy limit." Dykstra testified that CDIC's failure to consult with its insureds on the disclosure of policy limits did cause the insureds harm. This decision by CDIC forced Phillip to sue the insureds to obtain access to the policy through discovery, which precluded the insureds from trying to resolve the case without a lawsuit. He testified that

> refusal to disclose the limits pre-suit made it inevitable that [Phillip] would file a lawsuit against the insured regardless of whether the case eventually settled within limits.
> And that's because everybody understood that if the information about the policy wasn't provided, it could be immediately discovered once suit is commenced and served and a request made.

---

[20] Because we conclude the evidence permits the conclusion that CDIC's failure to disclose the policy limit, if found to be bad faith, proximately caused harm to the insured, we do not consider whether such bad faith, standing alone, would trigger the presumption of harm under *Butler*, 118 Wn.2d at 390.

CDIC argues on appeal that Phillip and his attorney never wanted to settle this case for policy limits and disclosing those limits would not have prevented any litigation or limited its insureds' liability. It presented deposition testimony from Phillip and his parents confirming that they never offered to settle for policy limits and suggesting they had no desire to settle with CDIC before filing this lawsuit. But whether early disclosure of policy limits could have avoided this lawsuit and a multimillion arbitration award against the insureds is ultimately a question of fact for trial.

We therefore reverse the trial court's order granting summary judgment on the reasonability of CDIC's failure to disclose its policy limits to Phillip in May 2017 without consulting its insureds and conclude there are issues of fact as to causation and damages.

2. The trial court correctly held that genuine issues of fact exist as to the reasonableness of the timing of CDIC's first policy limits settlement offer

CDIC argues that the trial court erred in denying its motion for partial summary judgment on the reasonableness of the timing of its first policy limits settlement offer on February 16, 2018. We disagree.

Under *Hamilton v. State Farm Insurance Co.*, 83 Wn.2d 787, 791-92, 523 P.2d 193 (1974), "if investigation of the circumstances and facts surrounding an accident disclose liability on the part of the insured, it is the affirmative duty of the insurer to make a good faith attempt to effect settlement." WAC 284-30-330(6) provides that it is an unfair method of practice for an insurer not to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

CDIC argues that it did not act unreasonably in waiting until February 2018 to make its policy limits settlement offer because a preliminary investigation indicated Zewdu entered the intersection on a yellow light when Phillip ran in front of the truck, and defense counsel was still evaluating the medical records through the end of 2017. It contends that "Mr. Zewdu's potential liability did not become reasonably clear until January 14, 2018 at the earliest, when [defense counsel] informed CDIC that the defense accident reconstructionist believed Mr. Zewdu entered the intersection on a red light." But these arguments are based on disputed facts.

Phillip presented expert testimony that CDIC breached customary claims handling standards and acted in bad faith by failing to negotiate a policy limits settlement with Phillip in June 2017 because CDIC understood the insureds' exposure at that point. The record indicates that less than a month after the accident, and nine months before making its first settlement offer, CDIC learned that two witnesses saw Zewdu run a red light when he hit Phillip. Soon after Phillip filed suit in May 2017, CDIC advised the insureds that they faced liability beyond the $1 million policy limit and suggested that they hire personal counsel. In June 2017, defense counsel notified CDIC that Phillip would be requesting policy limits, leading CDIC to raise its insurance reserve to $1 million on June 20, 2017. By December 2017, at the latest, CDIC was aware of the catastrophic extent of Phillip's injuries. In January 2018, defense counsel notified CDIC that Phillip's medical bills alone through July 2017 totaled almost $750,000 and advised it that

"[t]his is an apparent case of liability given the fact that our client entered the intersection against the light and struck the plaintiff in a crosswalk."

Viewing this evidence in the light most favorable to Phillip, a rational jury could find CDIC's delay in making a policy limits settlement offer was unreasonable and did not further the best interests of its insureds. We affirm the denial of summary judgment on this issue.

3. The trial court erred in concluding that Phillip cannot establish that CDIC's alleged bad faith in settling the personal injury action proximately caused the insureds to sustain an injury or damages

Phillip argues that the trial court erred in holding that he cannot establish that CDIC's insureds sustained injury or damages arising out of CDIC's alleged bad faith. We agree as to the bad faith claim arising out of CDIC's settlement decisions.

Tort claims for an insurer's breach of the duty of good faith allow for recovery of expenses; consequential damages; and "general tort damages," including noneconomic damages such as emotional distress caused by the breach of the duty of good faith. *Beasley*, 22 Wn. App. 2d at 661. If an insurer acts in bad faith in refusing to settle within policy limits, the remedies are, relevant here, a rebuttable presumption of harm and insurer liability for an excess verdict plus interest. *Besel*, 146 Wn.2d at 736-37; *Butler*, 118 Wn.2d at 393.

Phillip's theory below was that CDIC realized by June of 2017 that its insureds faced liability exposure in excess of policy limits, yet failed to begin negotiations at that point to determine if it could resolve this claim without litigation and without exposing its insureds to an excess judgment. He maintained that

when the insureds had the possible opportunity to settle the matter at mediation in a way that would have protected their assets from execution of any excess judgment, CDIC undermined that settlement effort by failing to have discovered the possibility of additional insurance coverage through Mack Trucking, the owner of the trailer Zewdu was pulling at the time of the accident. Phillip and his parents did not sign the April 2018 draft settlement agreement once they discovered the existence of additional insurance coverage. Then, after arbitration, when CDIC refused to pay the policy benefits to reduce the potential judgment against its insureds, they had to negotiate the best settlement they could achieve at that time which was materially less beneficial to the insureds than the offer on the table at mediation. Under the March 2019 settlement, Zewdu obtained Phillip's agreement not to execute against his personal property, but Ephrata Trucking could not obtain this same level of asset protection that it would have otherwise had under the April 2018 draft agreement.

Phillip argued that the insureds are entitled to a presumption of harm from the existence of the multimillion-dollar arbitration award and subsequent settlement, in which the insureds had to agree to a higher interest rate on the award in exchange for the delay in the entry of any judgment and execution against Ephrata's assets.

CDIC contends the trial court correctly concluded that the presumption of harm does not apply here. We disagree. Our Supreme Court has declined to apply the presumption in only two cases. First, in *Coventry Associates v. American States Insurance Co.*, 136 Wn.2d 269, 281, 961 P.2d 933 (1998), the Supreme

Court held the presumption of harm does not extend to claims of bad faith in adjusting first-party claims. *Id.* at 281. Second, in *St. Paul Fire and Marine Insurance Co. v. Onvia, Inc.*, our Supreme Court held that a presumption of harm does not arise in bad faith cases where the insurer correctly determined that it had no duty to defend or to indemnify but was negligent in investigating coverage, and the claim of bad faith consisted solely of alleged "procedural missteps" in the investigation. 165 Wn.2d 122, 126 & 133, 196 P.3d 664 (2008). Neither exception applies to most of the claims here.

Phillip's bad faith claims based on CDIC's settlement decisions are not *Coventry* first-party claims. And unlike *Onvia*, the bad faith failure to settle claims is not based on mere "procedural missteps" made in the absence of a duty to defend, but on the insurer's conduct in deciding when and whether to offer the policy limits as a part of a settlement with Phillip.[21]

We conclude that the presumption of harm applies to these bad faith claims because the alleged actions or omissions caused the insureds to negotiate a settlement in March 2019, under which they face greater exposure to Phillip than they may have faced had CDIC actively sought to settle the personal injury claim quickly and in a way that best limited the insureds' exposure.

---

[21] CDIC contends the presumption of harm should not apply because it defended its insureds without a reservation of rights. But the duty to defend includes a duty to attempt to negotiate a settlement in its insureds' best interest. CDIC cites no authority for the proposition that the presumption of harm arises only when a defense is provided under a reservation of rights. This court has previously applied the presumption in a case in which no reservation of rights was at issue. *See Moratti*, 162 Wn. App. at 512 (jury finding of bad faith leads to presumption of harm sufficient to support CPA verdict).

The presumption of harm is rooted in the tension that exists between an insurer's control over the defense of a third-party action and its fiduciary duty to give equal consideration to both its own and its insured's interests. *Butler*, 118 Wn.2d at 389-92. Relieving the insured of the burden of proving harm where the insured acts in bad faith "reflects the fiduciary aspects of the insured/insurer relationship." *Id.* 390. These same concerns are present here.

CDIC controlled the defense of Phillip's case, including the timing of its decision to offer to settle for the policy limit of $1 million. CDIC also controlled the investigation into the existence of other insurance, information crucial to its insureds' ability to achieve a mediated settlement in April 2018. It is undisputed that CDIC first offered to settle the claim for policy limits in February 2018. It is also undisputed that Phillip rejected that offer if it included a full release against the insureds.

According to evidence Phillip presented, by March 2018, CDIC understood that Phillip would not accept $1 million to release all claims against its insureds. CDIC learned that Phillip wanted to settle for a payment of the policy limits, a stipulation to submit the case to arbitration to determine the total amount of liability, an assignment of rights from the insureds, and a covenant not to execute on non-insurance assets of both Ephrata and Zewdu. Phillip and his counsel learned at mediation, apparently for the first time, that there may have been another $1 million in policy coverage through Mack Trucking and its insurer.

Phillip presented evidence that CDIC breached customary insurance claims handling practices by failing to investigate whether there was other insurance

coverage for Phillip's injuries. Although CDIC instructed Evergreen to investigate the possibility of additional sources of coverage, this investigation appears not to have occurred and CDIC did not follow up with either Evergreen or Zewdu about this possibility. According to Dykstra, CDIC's failure to learn of this possible source of settlement funding before the mediation harmed its insureds because he lost the opportunity to resolve the lawsuit without any exposure for an excess liability judgment.

CDIC refused to sign off on the April 2018 settlement proposal and pay its policy limits without a release of all claims against all insureds. Phillip was unwilling to give such a broad release because it could jeopardize his ability to trigger additional insurance coverage. According to Dykstra, CDIC's refusal to accept Phillip's settlement proposal exposed both insureds to liability "far beyond their indemnity limits."

The trial court thus erred in concluding that Phillip cannot establish that CDIC's insureds were harmed by CDIC's settlement decisions in Phillip's personal injury action.

## C. Phillip's Direct Claims for PIP Benefits

Finally, Phillip argues that the trial court erred in dismissing his direct, first-party claims for PIP coverage. We disagree.

RCW 48.22.085(1) provides that "[n]o new automobile liability insurance policy or renewal of such an existing policy may be issued unless personal injury protection coverage is offered as an optional coverage." RCW 48.22.095 sets minimum levels of PIP coverage for each "insured" to include medical and hospital

benefits of $10,000, funeral expenses of $2,000, income continuance of $10,000, and loss of service benefits of $5,000. "PIP insurance is designed to provide the insured with an immediate source of payment for out-of-pocket expenses resulting from [a car] accident," regardless of fault.[22]  *Barriga Figueroa v. Prieto Mariscal*, 193 Wn.2d 404, 411, 441 P.3d 818 (2019).

Phillip contends he is an insured under CDIC's policy because he was a pedestrian when he was struck by a CDIC insured commercial truck. He further argues that although an insured may reject PIP coverage via a written waiver under RCW 48.22.085(2), CDIC never offered and Ephrata never waived PIP coverage. He therefore maintains he is entitled to PIP coverage by estoppel based on CDIC's noncompliance with RCW 48.22.085(1) and 48.22.095.

CDIC agrees it did not offer PIP coverage to Ephrata, but argued below that it was not obligated to do so under WAC 284-20-300 because the named insured was a corporate entity. That regulation states:

> Mandatory offering of personal injury protection and required language when underinsured motorist coverage is rejected.
> (1) Insurers issuing an automobile liability insurance policy must offer the minimum personal injury protection coverage limits required in RCW 48.22.095, and must make available, if requested, additional personal injury protection limits as defined in RCW 48.22.100. Insurers may also offer other personal injury protection limits, in addition to these required offerings.
>     . . . .

---

[22]  (5) "Insured" means:
(a) The named insured or a person who is a resident of the named insured's household and is either related to the named insured by blood, marriage, or adoption, or is the named insured's ward, foster child, or stepchild; or
(b) A person who sustains bodily injury caused by accident while: (i) Occupying or using the insured automobile with the permission of the named insured; or (ii) a pedestrian accidentally struck by the insured automobile.

RCW 48.22.005.

(5) <u>This section does not apply to corporations, partnerships, or any other nonhuman entity named as the insured</u>.

(Emphasis added.)  The trial court agreed that under this regulation, CDIC was not required to offer PIP coverage to Ephrata.

Phillip argues that WAC 284-20-300(5) cannot eliminate the mandate in RCW 48.22.085(1) and nothing in the statute makes the mandate inapplicable to nonhuman commercial entities.  We disagree.

In June 1994, the Office of the Insurance Commissioner issued Insurance Bulletin 94-3, regarding the mandatory offering of PIP coverage to automobile insureds.  The commissioner wrote:

> Washington insurers and rating organizations have asked the Office of Insurance Commissioner to clarify the intent of Personal Injury Protection (PIP) coverage requirements with regard to commercial automobile insurance.  After reviewing the statute, we would advise that PIP coverage needs only to be offered to commercial auto consumers in cases where the named insured is an individual.
>
> RCW 48.22.095 requires that insurers provide PIP coverage to each insured.  RCW 48.22.005(5)(a) defines an insured as the named insured or a person who is a resident of the named insured's household.  In subsection (9), named insured is defined as the individual named in the declarations of the policy and includes his or her spouse if a resident of the same household.
>
> Therefore, the Insurance Commissioner believes that an insurer must offer PIP coverage for policies issued to a human person under a commercial auto policy, but does not apply to corporations, partnerships, or any other non-human entity named as the insured (reference to human and non-human is to avoid confusion with the legal description of a corporation as a person).  It appears clear that the definitions of insured and named insured apply to human persons and their families, and not to corporate entities.

WA Bulletin No. 94-3 (June 30, 1994), 1994 WL 16437865.

When the Office of the Insurance Commissioner first proposed the rule codifying this opinion, the agency indicated that insurers remained unclear how to offer PIP coverage to corporate entities when the PIP benefits themselves cover expenses that only a human, as opposed a business entity, would incur. *See* Wash. St. Reg. 09-17-124:

> There are companies that do not demonstrate a clear understanding of the amounts and way[s] that PIP coverage must be offered to insureds, and when insurers must offer PIP coverage on commercial auto liability policies. These proposed rules are intended to clarify this confusion and assist insurers in issuing PIP coverage with automobile insurance policies.

As the Insurance Commissioner noted, RCW 48.22.005(5) defines "insured" as including the named insured, a member of the named insured's household who is related to the named insured, or a person who sustains bodily injury caused by accident while occupying or using the insured automobile with the permission of the named insured or, as relevant here, a pedestrian accidentally struck by the insured automobile. And RCW 48.22.005(9) defines "named insured" to mean "the individual named in the declarations of the policy and includes his or her spouse if a resident of the same household." When we read these definitions in context with the language of RCW 48.22.085 and .095, we agree with the Insurance Commissioner that the statute does not impose a PIP mandate for commercial automobile policies when the named insured is not an "individual," or in other words, a nonhuman "person."[23]

---

[23] Although the Commissioner cannot bind the courts, we give deference to the Commissioner's interpretation of insurance statutes and rules. *Credit Gen. Ins. Co. v. Zewdu*, 82 Wn. App. 620, 627, 919 P.2d 93 (1996).

Phillip invokes Washington's strong public policy in favor of the full compensation of medical benefits for victims of road accidents. *Durant v. State Farm Mut. Auto. Ins. Co.,* 191 Wn.2d 1, 14, 419 P.3d 400 (2018). But public policy alone cannot overcome the language of the statute. It has been well-understood in the insurance industry since 1994 that an insurer must offer PIP coverage to commercial auto consumers only in cases where the named insured is an individual. Such was not the case here. We therefore affirm the dismissal of Phillip's direct PIP claim.

CONCLUSION

<u>IFCA</u>

We affirm the trial court's conclusion that CDIC's refusal to pay policy limits after confirmation of the arbitration award constituted a violation of IFCA as a matter of law. We conclude the trial court did not abuse its discretion in precluding CDIC, under the doctrine of judicial estoppel, from arguing that confirmation of the award failed to trigger a duty to pay interest on that award. We affirm the trial court's determination that the policy required CDIC to pay interest on the award at a rate of 7 percent, the statutory rate applicable to tort claims under RCW 4.56.110(3)(b). We also hold that the trial court erred in running interest through the date the policy proceeds were paid out of the court registry when, under the policy, CDIC's interest obligation ended when it deposited the funds into the registry. We conclude whether nonpayment of interest for two years was an unreasonable denial of benefits under IFCA should be decided by a jury. We reverse the trial court's ruling that Phillip cannot establish actual damages under

- 57 -

IFCA. Finally, we conclude that the trial court erred in denying attorney fees under *Olympic Steamship*, IFCA, and the CPA.

<u>Bad Faith</u>

We conclude there are genuine issues of material fact as to the reasonableness of CDIC's decision to withhold its insureds' policy information from Phillip and his attorney and its decision not to make a policy limits settlement offer until February 2018. We also conclude there are genuine issues of material fact as to whether CDIC's insureds produced evidence of injury or damages caused by CDIC's actions.

<u>PIP Coverage</u>

We conclude the trial court correctly held that CDIC had no legal obligation to offer PIP coverage to Ephrata because Ephrata is not an individual but a corporate entity. Because CDIC provided no PIP coverage, Phillip may not prosecute a direct, first-party claim for such coverage.

<u>Attorney Fees on Appeal</u>

Phillip requests an award of attorney fees on appeal under the CPA, IFCA, and *Olympic Steamship*. RAP 18.1(a) authorizes attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees or expenses on review." Because we conclude that Phillip was entitled to attorney fees below on all three bases, we award reasonable attorney fees to Phillip on appeal, subject to compliance with RAP 18.1.

We therefore affirm in part and reverse in part.

*Mann, J.*

WE CONCUR:

*Feldman, J.*          *Coburn, J.*